## THE FRANCIS & ELIZA.

(District Court, E. D. Louisiana. February 20, 1820.)[1]

NAVIGATION LAWS—FORFEITURE OF FOREIGN VESSEL.

Where a British vessel sailed from the island of Margarita to Jamaica, which, by the ordinary laws of navigation, is closed against vessels owned by citizens of the United States, and the captain landed there, and brought out passengers, and came to an American port, she is forfeited under the navigation laws providing that any vessel owned by British subjects, coming or arriving from any port or place in a British colony closed against the United States, shall be subject to forfeiture, though the vessel did not enter the port in Jamaica, but stood off and on while the captain was on shore.

HALL, District Judge. The libel in this case alleges that this ship, owned by British subjects, and having then come from a port or place in a colony or territory of his Britannic majesty (to wit, Falmouth, in Jamaica), which, by the ordinary laws of navigation, is closed against vessels owned by citizens of the United States, did attempt to enter the port of New Orleans, contrary to the act of congress entitled "An act concerning navigation." It appears that this vessel sailed from London in January, 1819, bound to South America, and to return to any port in England, or for any port she might have a cargo for. She sailed, and arrived at Margarita, having on board a considerable number of men intended to be employed in the service of the revolutionary government in Venezuela. She remained there some months, and on the 8th of November last sailed. It is alleged on the part of the United States that she sailed for Jamaica, and by the claimant that her intended port was New Orleans, but that want of provisions compelled the master, Capt. Coats, nine days after leaving Margarita, to stop a few days off Falmouth, in Jamaica, which port he visited in his boat; that the vessel never entered the port, but sailed off and on, waiting the return of the master; and that while at Falmouth he purchased some provisions, and then sailed for New Orleans. In support of

[1] This case has been heretofore reported in 7 Mart. (O. S.) 713, and is now published in this series, so as to include therein all circuit and district court cases elsewhere reported which have been inadvertently omitted from the Federal Reporter or the Federal Cases.

the libel the log book is referred to. The entry made on the 9th of November is in these words: "Francis and Eliza, Captain Coats, from island of Margarita to Jamaica." The next is: "Francis and Eliza, towards Jamaica." On Tuesday, the 16th of November, the following entry is made: "Captain Coats determined to send the boat ashore for provision. At 10, hove to, with head to the westward. At daylight made all possible sail. At 11, pilot came on board, and showed us the harbor of Falmouth. Bore up, and at noon Captain Coats went ashore with the passenger." On the 18th the next entry is: "Captain Coats came on board, and made all possible sail. At 12 Captain Coats went ashore, and passenger left the ship. On the 20th Captain Coats sent the skiff aboard with four bolts of canvas, and two small casks pork, and boat to return. On the 24th the boat came aboard with captain and one passenger." On the 25th the log book is headed: "Francis and Eliza, Captain Coats, towards New Orleans." In further support of the libel is a pass from Admiral Brion, dated at Juan Griago, November 8, 1819, granting permission to Capt. Coats, in the English ship Francis and Eliza, to proceed to the colonies friendly to the republic, requiring those under his jurisdiction not to interrupt him, and requesting others to aid and respect him. It appears, also, from a document in evidence, that while ashore, on the 16th November, 1819, Capt. Coats made application to the officers of the customs at Falmouth to have his register indorsed, which was refused him unless the vessel came into port; and the notary certifies that Capt. Coats considers it best (considering the great expense and detention that should arise) to proceed to New Orleans, and there report his case to the British consul, in order to get his name indorsed on the register. Martin Thomas, a witness, says that he sailed with Coats from Margarita, bound to Falmouth, in Jamaica; heard they were bound to Falmouth from the people on board; heard nothing about New Orleans till they came here; lay about four miles from Falmouth, but did not anchor. This witness has had a quarrel with Capt. Coats. Capt. Loomis, of the revenue cutter, in passing down the river, hailed the Francis and Eliza, and asked where she was from. The answer was, "Jamaica." Asked Capt. Coats what he was doing off Jamaica. He said he went in to get his name indorsed on the register, and to get a freight to England; but, the crops not coming in, he did not get one. He then determined to make for New Orleans for freight. Capt. Loomis told him he would be under the necessity of seizing the vessel under the navigation law. The captain then said he went in for provisions. Falmouth is a port closed to American commerce. On his cross-examination he says he does not know that it was the captain who answered his hail, though he thinks it was, as it is a matter of course for the captain to answer, and it was not afterwards contradicted. He asked Capt. Coats if he would not have taken a freight at Jamaica, who said he would have done the best for his owners. Capt. Loomis further says that, in nautical language, "touching" at a place is, standing in close to the land, and sending a boat ashore; and a vessel is said to be where her papers are; and when her papers are

in the custom house she is considered as in port. Lieut. Taylor says (he was an officer on board of the revenue cutter) Capt. Loomis hailed the Francis and Eliza. She answered "From Jamaica." Witness understood from the captain that he had put in at Falmouth for a freight. He heard nothing of distress, but understood from the captain that, not being able to get a freight at Jamaica, he had come here for it. Mr. Chew, the collector of this port, was on board the revenue cutter on the 6th of December last, when the Francis and Eliza was hailed by Capt. Loomis and answered "From Jamaica," and repeated it; heard no other answer. On the part of the claimants, Peter Heinds, first mate of the ship, was examined, and says: They first arrived in Margarita with about 170 or 180 passengers. Continued at Margarita, and along that coast, till November, when they sailed for New Orleans. That provisions were very scarce there, and could not procure enough for a voyage to New Orleans. Got a barrel of beef off St. Domingo from an American vessel. Had a crew of 25. The beef went little way to support the wants of the crew. They were without bread. Nothing aboard fit to eat but the barrel of beef. Between St. Domingo and the east end of Jamaica, fell in with a brig, solicited supplies, but could not obtain any. Proceeded on the voyage for New Orleans. Arrived off Falmouth, which was in the course of the voyage. The captain went ashore to get provisions. Procured two barrels of pork, one of flour, and some yams, and returned next day. Went ashore again for more provisions. Remained three or four days. He brought fowls, pigs, etc., and a small quantity of spirits,—four or five gallons; and sailed immediately for New Orleans. The island of Jamaica was the first land they could make with convenience and safety to get provisions. They could get nothing at Margarita, and lived on fishing, etc., about three weeks. He says there was no communication between Falmouth and the ship; did not cast anchor, but stood off and on. The provisions procured at Falmouth were barely sufficient to reach New Orleans. When the pilot came on board, had scarcely any. The first captain from London was Stone, who died on the passage. He was succeeded by the first mate, who died at Margarita. He does not know the ultimate object of the voyage. He signed articles for South America. Did not go to Jamaica for any other purpose but to procure provisions, to his knowledge. They did not go into Falmouth, because they were not bound there. That they could not go in if they wished, being to leeward, and having no pilot. Mr. Hanson says he wrote the log under the direction of the chief mate. The entries were made every morning. It would have been dangerous to enter Falmouth. It could not have been done in the then state of the weather. The accounts (see evidence) show the amount of provisions gotten at Falmouth. Were greatly distressed for provisions at Margarita. They eat ship's bread at Jamaica. Sometimes pork and beef, which were difficult to be procured. Could not get provisions at the island. George Glover says the agent gave him a passage to New Orleans, where he intended to come. He is an Englishman, and did not intend to go to Jamaica. His intention was to go from New Orleans

to London. He came in this vessel from London, and, if he could not have got another vessel, he would have worked his passage back to London. John Drixon was a seaman on board. On the 8th of November last, sailed for this port. Had nothing but salt herrings to eat at Margarita. Took two passengers at Jamaica, and landed a doctor of some sort. When they arrived off Falmouth were in great distress for provisions. Could not, with safety, have made New Orleans with their stock. They made St. Domingo after leaving Margarita. John Keen says they continued a long time at Margarita. Had but little provisions the latter part of the time. They were not on allowance at all on the voyage. Made St. Domingo. Got a barrel of beef off St. Domingo or Cuba. He believes the captain went ashore for provisions, and they were as near in as they could get when the boat went ashore. They had always something to eat, but the provisions were bad. Charles Jones Salmon was in Falmouth when the ship hove in sight. Pilot boat returned, and reported that she was bound to New Orleans. Capt. Coats came ashore, and went to a tavern kept by a relation, a Mr. Preston. He heard from the land waiter and searchers of the customs that she was from Margarita, was an armed vessel, and bound to New Orleans. The same day the captain purchased some provisions, which he saw taken to the wharf. Captain went aboard with Preston, and returned to Falmouth next day. That the captain and witness attempted to go aboard, but could not. Next morning, about 10, he descried the vessel from the upper part of a house, and supposed her to be off Montego Bay, about 25 miles. They got a boat, and boarded about 2 of the same day, and immediately made sail for New Orleans. The ship never entered Falmouth, nor was nearer than about four or five miles. He was on the quarter deck of the ship when hailed by Capt. Loomis. The pilot answered the hail that she was from Margarita and Jamaica. Capt. Coats was below. The revenue cutter sent her boat aboard with the lieutenant, who asked witness where she was from. Witness answered "From Margarita," but the boat went ashore at Jamaica. The only part of the conversation he heard was, Capt. Loomis asked Coats if he would not have taken freight at Jamaica. The captain laughed, and replied, "Yes." Charles Emlin embarked at Margarita to work his passage to New Orleans, as he was told. Did not hear that she was destined for any other port. That they were short of provisions. He heard Capt. Coats say on the voyage that he would put in at any port to get provisions, there being no provisions to be got at Margarita but bad flour. Capt. Thomas Coats says the ship in which he came from England was sold. That the owners of that vessel were interested in the house of Hanning & Richardson, to whom the Francis and Eliza belonged. That they were both under the control of Gold, the agent, who desired witness to take command of the Francis and Eliza, which he did on the 1st of October, at Margarita. That the agent gave him orders to proceed to New Orleans. The agent died, and she was obliged to remain to arrange his affairs. He did not sail from Margarita till 8th November. Prior to that, if he had been loaded with money,

he could not have got provisions from the shore. Every morning the boat went a fishing, and in fine weather went ashore with muskets to procure provisions. Left Margarita with 15 pieces of beef. Gave the people part of his own stores. Got one cask beef from an American vessel, and gave an order on R. D. Shepherd, of New Orleans. When off Jamaica, had not more than would last three days. Hove to off Falmouth. Refused a pilot, saying he only wanted provisions. Went ashore, and returned with a relation to see the ship. Was not able to make arrangements for ship's provisions on account of the smallness of the bill on London. Returned to Falmouth. Ship was blown off, and did not see her for two days. When he saw her, she was to the leeward of Montego Bay, where he joined her, and came here. He was ordered by Gold to take freight at New Orleans for England or the continent. At Margarita he obtained a letter for R. D. Shepherd & Co., which he delivered here. When hailed by the cutter, the pilot answered, "From Margarita and Jamaica." Does not know the original destination of the ship. His object in coming here was provisions and freight. Did not inquire for freight at Jamaica. If he had taken freight, he would have violated his orders. If freight had been offered, thinks he would have done the best for his owners. He had no written instructions from Gold, but was verbally directed to proceed to New Orleans. (See evidence.) He took a passenger from Margarita, and landed him at Falmouth. The passage was intended for New Orleans. He took a nephew at Falmouth, at the request of his cousin, and another young man, who was out of employ. He says that by the navigation laws of Great Britain the captain is obliged to have his register indorsed on change of master at the first port the ship arrives. It cannot be done at a foreign port. The certificate exhibited contains all the declaration he made at Falmouth.

Before we proceed to the examination of the merits of this case, it is proper to observe that the law upon which the libel is founded is a retaliatory law. It is intended to produce a great political effect; one of much importance to the trade and navigation of the United States. It is calculated so to operate upon Great Britain as to induce her to relax from her strict and rigid exclusion of American commerce and navigation from her ports on this continent and in the West Indies. In the construing of this law Great Britain cannot take it amiss if we apply in this case her own principles and rules of decision on similar subjects. In the case of The Beaver (April 28, 1812) 1 Dod. 155, Sir W. Scott observes:

"One cannot help feeling that in cases of this kind innocent parties may be exposed to great hazard and inconvenience. At the same time it must be recollected that the navigation laws are of great importance, and very inflexible in their nature. The national benefit must take precedence of the profit of individuals. The law presumes, too, that the party damnified has a remedy against him whose fault has caused the loss; and, although it may sometimes happen that the person from whom the remedy is to be sought is not, in point of solvency, able to make satisfaction, still that circumstance can make no difference in the legal principle, which remains unshaken."

On a subsequent day Sir William observes:

"There are circumstances in this case that would induce the court to re-gard it in the most favorable light, and to stretch as far as possible to give relief to the owners of this cargo. The parties have, I think, made out a case of perfect innocence of intention. Under these circumstances, it is impossible not to feel a desire to relieve from the penalties affixed by law upon illegal importation; but at the same time no door must be left open for the violation of the high interests which the navigation act was intended to protect."

He further observes:

"It was considered, I presume, that the object of the statute could not otherwise be attained than by imposing these penalties. The sacred rights of British navigation could not be upheld if these penalties could be avoided under the plea of ignorance. I am, therefore, clearly of opinion, if the strongest possible case of innocence were made out, it could not avail to protect the parties from the penalties imposed by this statute."

We here plainly discover that the policy of Great Britain is to secure to herself the monopoly of trade and navigation of her colonies. The policy of the United States, in passing this law, is no less obvious. It is to cut off and prevent all communication between the colonies of Great Britain and the United States until she shall consent to a mutual intercourse. It was not merely to prohibit the introduction of her produce from the islands and her other colonies that this measure was adopted, but to affect her navigation and trade. The law makes no difference whether the vessel be loaded or not:

"All British vessels coming or arriving from any port or place in a colony or territory of Great Britain, that is or shall be by the ordinary laws of navigation closed against vessels of the United States, such vessel shall be forfeited."

This being the evident intention of the law, let us examine the evidence that has been given. That the Francis & Eliza sailed from Margarita for Jamaica, I think, is pretty clearly shown. The first entry in the log book after leaving Margarita is, "Francis & Eliza, Captain Coats, from Margarita to Jamaica;" the next, "From Margarita towards Jamaica." Now, it appears from the testimony of William Hanson, who kept the log book, that it was kept under the direction of the chief mate; indeed, this is always the case. This entry, then, could not have been made without the direction of the chief mate, and he must have received his directions from Capt. Coats. Notwithstanding this, Mr. Heinds, the chief mate, swears that they sailed from Margarita to New Orleans. So much for Mr. Heinds. The next circumstance which goes to prove that the intention in the first place was to try some of the West India ports is the pass received from Admiral Brion. It is an order and request of Brion to all the revolutionary cruisers to respect the Francis and Eliza, going to the "colonies friendly to the republic." Now, if the real intention of Capt. Coats was to come to New Orleans immediately, the pass would not have been to the friendly colonies, but to the United States alone. Martin Thomas, who was a seaman on board, says he sailed with Capt. Coats from Margarita; were bound to Falmouth, in Jamaica. He heard they were bound to Falmouth from the people on board. He says on his cross-ex-

amination that he never heard the captain say they were bound for Falmouth. It is to be observed that a quarrel has taken place between the captain and this man, and perhaps his single unsupported testimony would not establish the fact of intention; but, taken in connection with other circumstances, it may have some weight. The next circumstance to show the destination of the vessel for Falmouth is the directness of the course for that port. The log book, on the 9th November, first announces the intention to proceed for Jamaica. Their course is N. E., E., E. N. E., etc. On the 12th St. Domingo was in sight; on the 15th, east end of Jamaica, S. W. by W., distance 6 leagues; people employed unbending small bower cable. On Tuesday, 16th, took in all small sails. Capt. Coats determined to send the boat ashore for provisions. At 2, hove to, with her head to the north. At daylight, made all possible sail. At 11, pilot came aboard, and showed us the harbor of Falmouth. Bore up, and at noon Capt. Coats went ashore with the passenger. On the 17th, captain was on shore. At 7, on the 18th, captain came aboard, and made all sail. At 11, captain went ashore, and the passenger left the ship. On 20th, Capt. Coats came on board with four bolts of canvas, and two small casks of pork; boat to return. On 24th, Capt. Coats came on board with a passenger. It was then that Capt. Coats determined to proceed to New Orleans, for, on the day after, the log book begins, "Francis and Eliza, Captain Coats, towards New Orleans." Another circumstance to show that it was the object of Capt. Coats to proceed from Margarita to Jamaica is the conversation between him and Capt. Loomis and Lieut. Taylor. Capt. Loomis says when he hailed the answer was, "From Jamaica." When on board, he asked the captain what he was doing off Jamaica. He said he went in to have his register indorsed, and for a freight. Crops not being in, he determined to proceed to New Orleans. After he was informed that the vessel must be seized, he endeavored to explain. He thinks the captain answered the hail. There seems to be some doubt as to this fact. Mr. Salmon says he is sure the pilot answered, and that the answer was "Margarita and Jamaica." Mr. Salmon states also that, when Capt. Loomis asked Capt. Coats if he would not have taken freight from Jamaica, he answered, laughing, "Yes." Lieut. Taylor says the answer to the hail was, "From Jamaica." Witness understood the master of the Francis and Eliza that he had put into Falmouth for a freight. The captain said nothing of distress. Understood from the captain that, not finding a freight at Jamaica, he came here. The collector says he was on board the revenue cutter, and heard the answer to the hail. It was, "From Jamaica," and was repeated. He heard no other. John Keen says they were as close in shore as they could get when the boat went ashore. That distress did not compel Capt. Coats to proceed to Falmouth can, I think, be easily shown. From the testimony and circumstances that I have detailed, it appears that he had views and motives to visit Falmouth. There is another circumstance which is a link in the chain: He had relatives in Falmouth. He lodged at his cousin's, and brought from Falmouth a nephew, with

an intention to carry him to England. I find no entry in the log book as to want of provisions on the voyage to Falmouth. It is only observed on the 14th of November. Capt. Coats saw an American schooner, went on board, and purchased one cask of beef. To establish the fact of distress, Mr. Heinds is examined. He says provisions were scarce, and could not get enough to proceed to New Orleans. Says they were without bread. Had nothing aboard fit to eat. That between east end of Jamaica and St. Domingo fell in with a brig, and solicited supplies, which were refused. No mention of the latter circumstance is in the log book. It is stated in the log book of Monday, 15th of November: "At noon boarded the brig Mary & Jane from Jamaica, bound to London. Several more vessels in sight." Now, it is to be recollected that this happened the day after they procured a cask of beef from the American schooner. No mention is made of the object of going on board, or that it was for provision; but the ingenious Mr. Heinds has positively sworn that they boarded for provisions, and that they were refused. If provisions had been their object, why did they not try some of the other vessels which were in sight? Some of their captains might not have been so uncharitable as the captain of the Mary and Jane. The true object of the visit was to make inquiry as to Jamaica, the east end of which was only six leagues off at daylight. John Keen says, in contradiction of Mr. Heinds' statement, that, although they had very little provision during the latter part of the time at Margarita, yet they were not at all allowanced on the voyage. Mr. Heinds is again contradicted by one of the seamen, William B. Hanson. Heinds says they had no bread on board, and nothing fit to eat but the cask of beef they got from the American schooner. Keen says they eat ship's bread at Jamaica; sometimes salt pork and beef. He says they could not get provisions at the island. The witnesses do not agree. One says they had nothing but salt herrings. Charles Emlin says there were no other provisions at Margarita than bad flour. Heinds says they had no bread. Hanson says they eat ship's bread. He, too, says that about a week before they left Margarita they were on half allowance. No mention is made of this in the log, or by the other witnesses. Now, in opposition to this, it appears that Capt. Coats, with a large crew, takes on board from mere motives of benevolence a Dr. Blair, to come to New Orleans; but, arriving at Jamaica, the doctor was put ashore, got employment there, and two more passengers were brought for New Orleans. But, if the necessity was so great, why did he not enter any of the friendly islands, for which he had a permission from Admiral Brion? Many of them were much nearer Margarita than Jamaica, which was the most distant in his route to New Orleans except Cuba. St. Domingo was in sight three days after leaving Margarita, two days before they met the American ship. No; it was not distress that drove him there. Was it to have his register indorsed, to endeavor to procure freight, and at the same time to visit his connections? I need not say that this plea of distress by mariners is always examined with a most scrutinizing eye. No instructions in writing are produced. The distress

which will excuse is well defined by Sir William Scott in the Case of the Eleanor in Edward's. "It must be urgent distress. It must be something of grave necessity when the party justifies the act upon the plea of distress. It must not be a distress created by himself, by putting on board an insufficient quantity of water or provisions for such a voyage; for there the distress is only part of the mechanism of the fraud, and cannot be set up in excuse for it." The same doctrine is held by the supreme court of the United States in the case of The New York, 3 Wheaton.

Distress being out of the question in the present case, let us inquire whether or not this voyage being intended by Capt. Coats from Margarita to Jamaica. His going in as close as he could get, his entering into the harbor with his boat, his landing a passenger there, his remaining there six days, his application to have the register indorsed there, and his actually bringing two passengers from there to this place, do not bring this vessel within the meaning of the law, which declares that any vessel owned by British subjects coming or arriving from any port or place in a colony of his Britannic majesty closed against the United States shall be subject to forfeiture. The captain must have considered the voyages as two distinct voyages; the log book stating the first from Margarita to Jamaica, and, after leaving there, for New Orleans. Jamaica then was the point of departure. So he answered when hailed. I have already stated that the policy of this law is to induce Great Britain to allow the United States to trade with her colonies. To effect this we say, "Your colonies shall have no communication with us until you change your system. You shall not import any produce to us. You shall bring no passengers to us in your ships." In this case, it appears that Capt. Coats brought two passengers from Jamaica. Suppose these passengers were asked, "From whence came you?" or, "From where did you arrive?" Their answer would be, "From Jamaica." "In what ship did you come?" "In the Francis and Eliza; but she did not come from Jamaica." "How so? You came in her from Jamaica, and she has not come from Jamaica?" "No. She was laying off, and we went aboard in the boat." Shall this be an excuse to evade our navigation laws? Suppose they had brought from thence a cargo of sugar, which had been put aboard from lighters and small vessels three leagues from the shore, would this have excused her? Does not the navigation of a country derive sometimes as much advantage from the carrying of a passenger as from carrying a cargo? Suppose Capt. Coats had heard that there were 200 more patriots at Jamaica anxious to join their compatriots at New Orleans, and he had brought them to this place, together with his nephew, Charles Alexander, and Jones Salmon, who were both landed here, would this be no violation of our navigation law? If the British had permitted American vessels to visit their colonial ports, our navigation might have shared, perhaps, the honor and profit, too, of conveying half of this patriotic band. Upon the whole, it is ordered, adjudged, and decreed that said vessel, her tackle, furniture, etc., be forfeited to the United States.